IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 15, 2015 Session

**STATE OF TENNESSEE v. ADRIAN MARCEL NEWBILL**

**Appeal from the Circuit Court for Marshall County
No. 59CC1-2013-CR-139     Franklin Lee Russell, Judge**

---

**No. M2014-01120-CCA-R3-CD – Filed October 7, 2015**

---

The defendant, Adrian Marcel Newbill, was convicted by a Marshall County Circuit Court jury of the possession of 26 grams or more of cocaine, a Schedule II controlled substance, with the intent to sell/deliver, a Class B felony, and was sentenced by the trial court as a Range I, standard offender to twelve years in the Department of Correction. The defendant raises two issues on appeal: (1) whether the evidence is sufficient to sustain his conviction, and (2) whether the trial court imposed an excessive sentence. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Michael Meise, Dickson, Tennessee (on appeal); and James Ronald Tucker, Shelbyville, Tennessee (at trial and on appeal), for the appellant, Adrian Marcel Newbill.

Herbert H. Slatery III, Attorney General and Reporter; Michael M. Stahl, Assistant Attorney General; Robert Carter, District Attorney General; and Weakley E. Barnard, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On August 26, 2013, officers with the 17th Judicial District Drug Task Force used a confidential informant to set up a controlled buy of crack cocaine from Laura Carter, who was traveling in the backseat of a small SUV driven by the defendant with a third person, Shawn Cross, riding as the front seat passenger. When the SUV failed to stop at

the Lewisburg KFC where Ms. Carter had arranged for the sale to take place, officers stopped and searched the vehicle and its occupants, finding a bag of crack cocaine on Ms. Carter's person, two additional bags of crack cocaine and some pills underneath the driver's seat, and a crack pipe between the driver's seat and the center console. The defendant, Ms. Carter, and Mr. Cross were subsequently indicted by the Marshall County Grand Jury for possession of twenty-six or more grams of cocaine with the intent to sell and possession of twenty-six or more grams of cocaine with the intent to deliver. On February 18, 2014, the defendant proceeded to trial alone before a Marshall County Circuit Court jury.

Winchester Police Officer Chris Smith, a former agent with the 17th Judicial District Drug Task Force, testified that he participated in the August 26, 2013 undercover drug transaction by posing as the brother of the confidential informant who was arranging a controlled buy of one ounce of crack cocaine from Laura Carter. The informant and Ms. Carter's initial phone call, which took place on speaker phone at the home of the informant, consisted of a discussion of Ms. Carter's "capability of getting the . . . ounce of cocaine." Officer Smith testified that Ms. Carter told the informant that she would have to call "her boy" and would call back to let him know if the deal "would be good to go." She called back, told the informant that "her boy, Tony," had what they needed, that the price was $1,400 for one ounce of crack cocaine, and that she would call them back when they were "on their way from Columbia to . . . Lewisburg." Officer Smith subsequently learned that "Tony" was Shawn Cross.

Officer Smith testified that Ms. Carter called about thirty minutes later to say that they were en route to Lewisburg and then called again when she was closer to town to say that Mr. Cross wanted to talk to the informant. During these conversations, she mentioned that "A.D.," later identified as the defendant, was driving and that the vehicle they were traveling in was a gray SUV. Officer Smith said that when Mr. Cross spoke with the informant, he reiterated that the price was $1,400 and asked about Officer Smith's presence in the informant's vehicle. Officer Smith testified that the informant reassured Mr. Cross that Officer Smith was the informant's brother and told him that he was there to prevent the informant from getting "burnt" in the transaction by ensuring that "it's what it's supposed to be." During that conversation, Mr. Cross agreed to the informant's suggestion that the transaction take place in the parking lot of the Lewisburg Walmart.

Officer Smith testified that he notified the surveillance team of the location and started with the informant toward Walmart. While they were en route, Ms. Carter called to tell them that Mr. Cross wanted to change the location to the KFC, located at the other end of the parking lot from Walmart. Officer Smith said he radioed his team of the change, and he and the informant continued toward the area. As they were about to turn

2

into the parking lot, the informant received a call from Ms. Carter from a different phone number, informing them that she was at the KFC and that they should come pick her up.

Officer Smith testified that he and the informant were pulling into a parking spot at the KFC when he looked to his left and saw a small, silver Mercedes SUV with "two black males and a female, looking over at [them]," pulling out of the parking lot and heading down Highway 50 toward Columbia. He informed Lieutenant Daugherty and then went inside the KFC, where he learned from the manager that a female had used the restaurant phone and the women's restroom. Officer Smith said he checked the phone, which was the same number as the one used by Ms. Carter to call the informant. He also searched the restroom but found no evidence of any narcotics. On cross-examination, he acknowledged that the informant never spoke with the defendant.

Captain Bartley Paul Fagan of the Marshall County Sheriff's Department testified that he assisted in the Drug Task Force's August 26, 2013 drug investigation by following and stopping a small, silver Mercedes SUV that came out of the Walmart parking lot and turned onto Highway 50 headed toward Columbia. Two African-American men were in the front seat of the vehicle, and a Caucasian woman was seated behind the driver in the backseat of the vehicle. When he approached the driver, later identified as the defendant, and asked for his license, the defendant handed him a Kentucky identification card instead. The Drug Task Force officers arrived at about that time, and he handed the defendant's identification to Lieutenant Daugherty before turning his attention to the front seat passenger, Shawn Cross, who initially gave him a false name and social security number. Captain Fagan testified that Mr. Cross was wanted in Maury County on drug charges and a parole violation. On cross-examination, he acknowledged that the defendant immediately pulled over when he activated his lights.

Lieutenant Shane Daugherty of the 17th Judicial District Drug Task Force testified that he was present with Officer Smith at the home of the citizen informant when the informant made a recorded telephone call to Ms. Carter to set up the drug transaction. According to Lieutenant Daugherty, Ms. Carter was going to get a ride and bring her supplier with her to Lewisburg to sell one ounce of crack cocaine to the informant and Officer Smith, who was posing as the informant's brother. Lieutenant Daugherty testified that he assigned duties to the officers involved, including Agent Martin and Lieutenant Doley, who were the first to leave to set up surveillance in the Walmart parking lot where the transaction was supposed to occur. Before Officer Smith and the informant reached the location, however, Lieutenant Doley informed them that he had pulled up next to the suspect vehicle and believed that "surveillance had gotten burned[.]" Lieutenant Daugherty explained that Lieutenant Doley was driving a vehicle that had been seized from a Maury County crack dealer, which would have been "very well known" to individuals involved in the Maury County drug trade.

Lieutenant Daugherty testified that he and Assistant Director Miller arrived at the location in time to see the Mercedes SUV pull into the KFC parking lot, drive around one side of the building as Officer Smith and the informant were on the other side, and then exit the parking lot and turn right toward Highway 50. He said he first instructed Captain Fagan to follow the Mercedes SUV and then instructed him to stop it after Officer Smith had searched the KFC bathroom and reported that neither Ms. Carter nor any narcotics were inside.

Lieutenant Daugherty testified that when he went to the location of the traffic stop, he observed the defendant seated in the driver's seat, Shawn Cross seated in the front passenger seat, and Laura Carter seated in the backseat behind the defendant. Among the items recovered from the vehicle and its occupants were a "big rock of crack cocaine in a plastic bag," from Ms. Carter's crotch area, two small bags of cocaine and a clear bag containing white pills from underneath the back side of the driver's seat of the vehicle, a crack pipe from the area between the driver's seat and the center console, and a Blackberry cell phone from the defendant's person.

Lieutenant Daugherty testified that he was interviewing the defendant at the jail when the defendant's phone vibrated. He said he picked it up and read the following text message, which he photographed: "Man this Kristi tell him need forty and thirty." Earlier in his testimony, Lieutenant Daugherty explained that someone stating that he wanted "thirty" was drug lingo meaning that the person wanted $30 worth of cocaine. He testified that, during the interview, the defendant told him that he was a crack addict, that the crack pipe found in the vehicle was his, and "that he would give Mr. Cross rides to different customers' houses in Columbia in exchange for crack cocaine." Lieutenant Daugherty identified the defendant's written and signed statement, which he read to the jury and which was admitted as an exhibit:

Shawn Cross called me to come pick him up at gas station (Spur) downtown. Laura showed up with her family. Shawn Cross gave me $10 to give to Laura as gas money for her ride to the Spur. Shawn Cross tells me to head to Lewisburg. Laura asked to use my phone to call person(s) who she & Shawn Cross were going to meet in Lewisburg. Heard Laura quote a price of $1,400.00 to person she was talking to name Jeff. Laura hands Shawn my phone to also talk to Jeff. Heard Shawn arrange to meet Jeff at KFC. Once at KFC, I drop Laura off at KFC. Me & Shawn Cross then drove around the area. While driving around area we saw Bill Dorelle (MCSO). Shawn told me to go pick up Laura at KFC, which I did. As we where [sic] headed out Hwy 50 we got stopped by Law Enforcement. Upon seeing the blue lights, I heard Shawn Cross say to Laura, "Here hold

4

this," however I did not see an exchange of items. I did see a baggie in Shawn's hands. I did know that Shawn was wanted by MCSO on drug related crimes. I also heard Laura talking to Shawn about getting her 20% for selling the cocaine for Shawn Cross.

On cross-examination, Lieutenant Daugherty acknowledged that the defendant never specifically stated that he drove Mr. Cross around Columbia to help him get to his drug transactions but instead said merely that he would give Mr. Cross a ride to different locations in Columbia in exchange for crack cocaine.

Agent Rebecca Hernandez of the Tennessee Bureau of Investigation, the forensic chemist who analyzed the three samples submitted in the case, testified that all three consisted of a substance containing cocaine base. The first sample, recovered from Ms. Carter, weighed 23.10 grams, the second sample, recovered from the backseat, weighed .43 grams, and the third sample, also recovered from the backseat, weighed 3.40 grams, for a total of 26.93 grams.

Director Timothy Lane of the 17th Judicial District Drug Task Force testified that twenty-six grams of crack cocaine would contain up to 125 individual "dosage units." In his vast experience, he had never seen anyone in possession of that amount of the drug who "wasn't involved in distributing crack cocaine."

The defendant, who acknowledged he was a crack user, testified that he had become friends with Mr. Cross the previous year and regularly drove him on errands around Columbia in exchange for crack cocaine or a small amount of cash. As time went by, he became aware of Mr. Cross's "dealings with the police in Maury County" and made it clear to him that he did not want Mr. Cross to have any drugs in his vehicle. The defendant said that Mr. Cross respected his wishes and that he was never a party to any of Mr. Cross's drug dealings.

On the day in question, Mr. Cross asked the defendant to pick him up at the Spur gas station and take him to Lewisburg so that Mr. Cross could pay his girlfriend's rent. The defendant said that he asked Mr. Cross for $25 in exchange for the trip. On cross-examination, he added that about five minutes after he picked up Mr. Cross, Ms. Carter got into the vehicle at the station too, telling him that she was going to meet someone in Lewisburg. The defendant said that Mr. Cross gave him $10 to give to the people who had dropped off Ms. Carter to pay for their gas.

The defendant testified that during the drive to Lewisburg, the radio was playing and he was arguing with his wife on his cell phone, which Mr. Cross had given him three days earlier after he broke his own phone. Consequently, he was not paying much

attention to Mr. Cross and Ms. Carter's conversation in the vehicle. He recalled hearing Ms. Carter mention something about $1,400 about ten to twelve minutes into the drive and heard her say something about "20 percent" just before they reached Lewisburg, but he had no idea what she was talking about. The defendant testified that the first time he realized something was wrong was when Ms. Carter handed the phone to Mr. Cross as they were pulling up to the KFC and the "terminology [Mr. Cross was using] changed."

On cross-examination, the defendant denied that he was a drug dealer or knew anything about the August 26 drug transaction until he pulled into the Walmart parking lot. He said he never suspected that Mr. Cross was conducting drug deals during the 100 or so times he gave him rides over the past year, despite the fact that Mr. Cross's visits at each residence lasted only "15, 20 minutes, tops." He also did not find it suspicious that Ms. Carter accompanied them on their trip to Lewisburg or that Mr. Cross gave her $10 for gas. The defendant acknowledged he had a conviction in Michigan for stealing and retaining without consent property belonging to another, four theft by deception convictions in Kentucky, and a robbery in the second degree conviction in Kentucky.

Following deliberations, the jury found the defendant guilty of both counts as charged in the indictment. The trial court merged the possession with the intent to deliver conviction into the possession with intent to sell conviction and sentenced the defendant as a Range I, standard offender to the maximum term of twelve years at thirty percent in the Department of Correction. This appeal followed.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant contends that the evidence is insufficient to sustain his conviction, arguing that the State failed to establish that he knowingly delivered or sold a controlled substance. In support, he cites his own testimony in which he claimed complete ignorance of the purpose of the trip and denied having heard any of the "drug transaction" conversations Mr. Cross and Ms. Carter held with the informant while in his vehicle. The State argues that the evidence was sufficient for a rational trier of fact to find the defendant guilty of the offenses beyond a reasonable doubt under the theory of criminal responsibility for the actions of another. We agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or

6

jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of a violation of Tennessee Code Annotated section 39-17-417(a)(4), (i)(5), which makes it a Class B felony to knowingly possess 26 grams or more of cocaine with the intent to sell or deliver it. Tennessee Code Annotated section 39-17-419 provides in pertinent part: "It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing."

A person is criminally responsible for the actions of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2). Criminal responsibility is not a separate crime but "is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999).

7

When viewed in the light most favorable to the State, the evidence was sufficient for the jury to find the defendant guilty of the offense under a theory of criminal responsibility for the actions of Mr. Cross and Ms. Carter. The defendant admitted at trial that he was aware that Mr. Cross was a drug dealer wanted by the police, that he regularly drove him on errands in exchange for cash or crack cocaine, and that he expected to be paid $25 for the August 26, 2013 trip to Lewisburg. The State presented evidence to establish that Mr. Cross and Ms. Carter had several detailed telephone conversations with the informant about the drug deal during the time that the defendant drove them in his small SUV to Lewisburg. The State also presented evidence to show that the defendant received a text message on his cell phone in which the sender, using drug jargon, said to tell "him" that she wanted to purchase $30 and $40 worth of crack cocaine. In his reply brief, the defendant reiterates his claims of ignorance of the purpose of the trip and argues that a rational jury could not have inferred, based on the circumstantial evidence, that he had the same criminal intent as Mr. Cross and Ms. Carter. However, by convicting the defendant of the offenses, the jury obviously found his claims of ignorance and innocence incredible. We conclude, therefore, that the evidence is sufficient to sustain the defendant's conviction for the possession of 26 grams or more of cocaine with the intent to sell or deliver.

## II. Sentencing

The defendant contends that his sentence is excessive and contrary to law, arguing that the trial court erred by not applying any mitigating factors and by not imposing the minimum sentence in light of the defendant's limited involvement in the crime and the "great need to preserve the State's limited resources." The State argues that the trial court imposed an appropriate sentence after proper consideration of all relevant law and principles of sentencing. We agree with the State.

Under the 2005 amendments to the sentencing act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2014).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

The trial court found two enhancement factors applicable to the case: the defendant's history of criminal behavior and criminal convictions in addition to those necessary to establish his range, which the court weighed heavily, and the defendant's failure to comply with the conditions of a sentence involving release into the community, to which the court attributed only slight weight. See Tenn. Code Ann. § 40-35-114(1), (8) (2014). The court found one factor in mitigation, that the defendant's conduct neither caused nor threatened serious bodily injury. See id. § 40-35-113(1). The court considered, but rejected, the defendant's proposed mitigating factors that substantial grounds existed to excuse or justify his conduct, that he played a minor role in the commission of the offense, and that he committed the offense under such unusual circumstances that it was likely he was motivated by a sustained intent to violate the law. See id. § 40-35-113(3), (4), (11). The court, therefore, sentenced the defendant to twelve years, the maximum sentence for a Range I offender convicted of a Class B felony.

The record reflects that the trial court properly considered the relevant purposes and principles of the Sentencing Act and imposed a sentence within the applicable range for the defendant's Class B offense. Accordingly, we find no abuse of discretion in the sentencing imposed by the trial court.

9

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____

ALAN E. GLENN, JUDGE